**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————
                              :

TRICIA SURINA and JAMES D. SURINA, :
                              :

                Plaintiffs,   :         Civil Action No.: 17-2173 (FLW) (TJB)
                              :

              v.            :
                              :            **OPINION**

SOUTH RIVER BOARD OF      :
EDUCATION, *et al.*,           :
                              :

              Defendants.   :
———————————————————:

**WOLFSON, United States District Judge:**

Plaintiffs Tricia and James Surina (collectively, "Plaintiffs") are parents of A.S., who is an autistic child; they brought this § 1983 action against various State and District Defendants.[1] Plaintiffs allege that District Defendants violated Plaintiffs' constitutional rights by engaging in sham investigations of child abuse and neglect, and that Defendants retaliated against Plaintiffs for exercising their First Amendment rights to advocate for their disabled child. In addition to these federal claims, Plaintiffs also bring parallel state claims against the District Defendants under the New Jersey Civil Rights Act, and a claim for intentional infliction of emotional distress. Plaintiffs also bring one count against State Defendants under § 1983 for violations of

---

[1] Throughout the Opinion, the Court will refer to the groups of Defendants as "State Defendants" and "District Defendants." The State Defendants are Lisa Von Pier, Director of the New Jersey Division of Child Protection & Permanency ("DCPP") and Allison Blake, Commissioner of the Department of Children and Families ("DCF"). The District Defendants are South River Public School District ("South River" or "District"), Michael Pfister, Superintendent of South River Public Schools; Margaret Pribyl, Director of Special Student Service; Odalis Delatorre, Case Manager; Charles Erlich, Special Education Consultant; and Wayne Sherman, Principal of South River.

the Fourth, Fifth, and Fourteenth Amendments for allowing DCPP workers to commit abuse of process against Plaintiffs.[2] The State Defendants move to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), claiming sovereign immunity, and District Defendants also separately move to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs have not stated any claims upon which relief can be granted.[3]

For the following reasons, State Defendants' Motion to Dismiss is granted, and Count III is, consequently, dismissed with prejudice. District Defendants' Motions to Dismiss are granted with prejudice as to Count I and Count V, and without prejudice as to Count II and Count IV. Plaintiffs may amend their Complaint, consistent with this Opinion, as to Counts II and IV, within twenty (20) days of this Opinion. If Plaintiffs wish to assert a *Monell* claim against South River, they may do so at that time.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are residents of the Borough of South River, Middlesex County, New Jersey and are the legal and biological parents of A.S., an autistic child attending school at South River. Compl. at ¶ 4. A.S. has a severe expressive and receptive language disorder. *Id.* The named Defendants include both District Defendants and State Defendants. *Id.* at ¶¶ 5–15.

---

[2] The Complaint also names as a Defendant a DCPP caseworker named "Jackie." There is no indication that Jackie was actually served in the case, pursuant to Rule 4(m) of the Federal Rules of Several Procedure, so if Plaintiffs do not submit proof of service by Order To Show Cause within fourteen (14) days of this Opinion, the Court will dismiss all claims against Jackie.

[3] Mr. Erlich also separately moves to dismiss on the basis of improper service of process. Mr. Erlich was never served in this case, but Plaintiffs argue they had good cause because they did not know his address. Certainly, there is no indication that Plaintiffs acted in bad faith in failing to serve Mr. Erlich. Moreover, Mr. Erlich was on notice of the Complaint, as, unlike Defendant Jackie, he filed a Motion to Dismiss. Thus, the court will excuse Plaintiffs' failure to serve Mr. Erlich, and will reach the merits of the claims against him.

The dispute between the parties dates back to early 2015. After A.S. transferred to South River, Plaintiffs entered into an agreement with the District to meet A.S.'s special educational needs, *Id.* at ¶ 103, but from early 2015 through 2016, numerous ongoing disputes arose between the parties concerning the needs and well-being of A.S. *See id.* at ¶¶ 18-127.[4]

In particular, the Complaint alleges that the problems between the parties began on March 30, 2015, when Mrs. Surina received a phone call from District Defendants, Mr. Sherman and Ms. Pribyl, informing her that two of her son's classmates had reported that her son was mistreated by his 1:1 aide. *Id.* at ¶ 18. After Mrs. Surina requested an incident report on the mistreatment, Mr. Sherman left a message for Mrs. Surina informing her that the DCPP did not require him to make any reports, and that, therefore, no reports were or would be made. *Id* at ¶ 19. Nonetheless, a few weeks later, a South River Policeman was able to retrieve an incident report for Mrs. Surina, which was dated March 31, 2015 at 8:41 A.M., approximately four hours before Principal Sherman left Mrs. Surina the message. *Id.* at ¶ 24.

On April 29, 2015, Mrs. Surina sought to observe her child in school, but was "unable to secure classroom observation times." *Id.* at ¶ 25. Thereafter, she took a walk on the public sidewalk adjacent to the school playground during her son's recess period. *Id.* at ¶ 26. While

---

[4] In my previous opinion dismissing Plaintiffs' claims against Defendant Robert Pruchnik, I explained some of the background of these disputes, stemming from the District's position that it was not required to directly fund an observation visit by Plaintiffs' educational expert, Dr. Michelle Havens. *Surina v. S. River Bd. of Educ.*, No. 17-2173, 2018 WL 1327111, at *1 (D.N.J. Mar. 15, 2018). As I then noted,

> because of the various disputes, it appears that Plaintiffs have filed three separate requests, in an administrative setting, to enforce Plaintiffs' previous settlement with the District. In addition, Pruchnik, on behalf of the District, also filed two due process petitions against Plaintiffs to enforce the parties' Agreement. On December 30, 2015, the Office of Administrative Law approved a settlement agreement as to the due process petitions filed by the District.

*Id.*

looking for her son, a recess aide yelled "you are too close to the children! You must immediately cross the street!" *Id.* at ¶ 27. Mrs. Surina returned home and called the South River Police Department to file a harassment complaint against the unknown recess aide. *Id.* at ¶ 28. A police officer, Patrolman Sullivan, arrived at Mrs. Surina's home and began to take her statement, but was soon joined by Sergeant Kevin Nielsen, who began questioning Mrs. Surina about why she was walking on the sidewalk near the school playground. *Id.* at ¶ 29. Neilsen then returned to the school and wrote a Suspicious Person Complaint against Mrs. Surina "on behalf of Principal Sherman." *Id.* at ¶ 31. The report stated Mrs. Surina was on the public sidewalk looking at the children, and that Principal Sherman "was concerned for the safety of the children." *Id*. at ¶ 32.

During the winter, spring, and summer of 2015, South River reached a verbal agreement with Mrs. Surina permitting her to drop A.S. off and pick him up at the side entrance of the school and allowing his 1:1 teacher to escort him inside. *Id.* at ¶ 37. A.S. had scored in the fifth percentile for personal safety cognition, which necessitated him having an adult with him at all times. *Id.* at ¶38. After reaching this agreement with the District, Mrs. Surina also requested an Independent Educational Evaluation. When the District failed to respond to her, she filed a complaint with The New Jersey Office Of Special Education Programs. *Id.* at ¶40. That fall, however, Plaintiffs allege that Principal Sherman informed Mrs. Surina that the District was no longer providing her any special privileges to drop her son off in the rear of the school. *Id.* at ¶ 41.

Plaintiffs' claims primarily stem from an incident in March 2016 that Plaintiffs call "retaliation" for their involvement in these disputes. That month, A.S. was absent from school for a period of time, and Ms. Pribyl and Ms. Delatorre, the case manager, met with the school

attendance officer, Ms. Widman, and instructed her to send a truant officer to the Surina home "to get more information about [A.S.'s] illness." *Id.* at ¶ 43. On March 21, 2016, the truant officer visited the home even though Mrs. Surina, that morning, "had faxed a signed Doctor's Excusal From School note to Ms. Widman." *Id.* at ¶ 42. Ms. Delatorre stated in her recorded report to DCPP and the South River Police Department that the school had received doctors' notes excusing the child from school due to illness, but stated that she did not like the fact that the doctors worked for a medical clinic, the notes had no diagnosis, and Mrs. Surina did not take him to his usual Pediatrician. *Id.* at ¶ 71. Ms. Delatorre also reported that A.S. had hygiene issues, including dirty hair, body odor, and wore the same pants three days in a row, and alleged that Mrs. Surina made her son bathe in scalding water. *Id.* at ¶ 72.[5] Two days after the truant officer's visit, Mrs. Surina submitted a "Request To Enforce A Court Order" to the New Jersey Office Of Special Education Programs and Mr. Pfister. *Id.* at ¶ 44.

On March 24, 2016, at approximately 4:15 P.M., Mrs. Delatorre, after speaking with Mr. Pfister and Mr. Sherman, issued a report to DCPP and the South River Police Department stating that Mr. and Mrs. Surina's son was missing and neglected. *Id.* at ¶ 45. At 4:30 P.M. that day, Patrolman Matthew Eitel arrived at the Surina home and informed Mrs. Surina that he had received a call stating that her son was "missing." *Id.* at ¶ 45. Mrs. Surina informed the officer that her son was sick and in bed. *Id.* Officer Eitel and Mrs. Surina were soon joined by Patrolman Christopher Monek, who informed them that he was there to perform a welfare check at the request of DCPP. *Id.* at ¶ 47. After showing the patrolmen the doctor's note, Mrs. Surina brought A.S. to the door, where the patrolmen were waiting, in order to show them he "was not missing

---

[5] In fact, Mrs. Surina later obtained a log in which the school nurse noted in January 2016 that A.S.'s 1:1 aide brought him into her office three times due to A.S.'s hygiene issues. *Id.* at ¶ 73.

and was well cared for." *Id.* at ¶ 48. Apparently satisfied, the patrolmen called DCPP to inform them that A.S. was home sick. *Id.* at ¶ 50. Donna Thasher, South River Police Department operator, memorialized the call, writing: "Patrol stated he spoke with the mother of the child, the child is in good health. Doctors notes were provided. Child Services were called back and a message was left." *Id.* at ¶ 52.

Later that day, after the two patrolmen had departed, Mrs. Surina received another visit from South River authorities. At 7:30 P.M., Officer Waranowicz, from the South River Police Department, and two DCPP investigators arrived at the Surina home. *Id.* at ¶ 53. Officer Waranowicz informed Mrs. Surina that a report was made that her child was missing and he was there to provide assistance to the DCPP workers. *Id.* Plaintiffs allege that Officer Waranowicz then demanded that Mrs. Surina allow him and the DCPP investigators into her home. *Id*. at ¶ 54. Mrs. Surina asked the officer if he had a warrant, and Officer Waronowicz responded that he did not need a warrant to see if a child was missing. *Id.* at ¶ 55. Mrs. Surina told him that "two officers were at her home earlier and saw that her son was not missing and in good health and that they were going to inform DCP[ ]P of those facts." *Id.* at ¶ 56. The DCPP investigators stated that they received the message from the two officers but they, nonetheless, had to conduct a follow-up investigation. *Id.* at ¶ 57. Mrs. Surina asked them if they had an order to investigate, and they claimed they did not need one because "a child might be missing and in danger." *Id.* at ¶ 58.

After Mrs. Surina closed the interior door, Officer Waranowicz then began banging on the door and again "demanded entrance into her home for himself and the DCP[ ]P workers." *Id.* at ¶ 60. Mrs. Surina alleges that she "suddenly felt dizzy and relented to letting the DCP[ ]P workers inside," but stated that the officer had to remain outside. *Id.* at ¶ 61. Officer Waranowicz

6

nonetheless entered the home, and the DCPP case workers told Mrs. Surina that it was policy to

have the police accompany them. *Id.* at ¶62. The case workers then stated that the "real reason

that they were investigating is that the reporter claimed that A.S. had bad hygiene." *Id.* at ¶64.

The DCPP investigators then searched the Surina home and asked Mr. and Mrs. Surina a number

of questions about their familial environment. *Id.* at ¶ 68. The investigators left after two hours at

the Surina home. *Id.* at ¶ 69.

This was not the end of Plaintiffs' allegedly contentious interactions with Defendants.

Mr. and Mrs. Surina attended a July 15, 2016 meeting, at which Mr. Pfister and Mr. Erlich were

present, to discuss A.S's individualized education plan ("IEP") for the 2016/2017 school year.

*Id.* at ¶ 82. Plaintiffs allege that Mr. Pfister stated that if the Surinas went forward with their Due

Process petitions, "he would use all of the school's vast resources to defeat them." *Id.* at ¶ 83.

Mr. Erlich "seemed to be amused by Mr. Surina's discomfort and began to snicker," and, rather

than stopping when Mr. Surina asked him to, he jumped to his feet and exclaimed "I'm not taking

anymore of you verbal abuse!" in Mr. Surina's face, at which point Mrs. Surina ended the

meeting. *Id.* at ¶ 85.  Plaintiffs also complain that Ms. Pribyl and Ms. Delatorre repeatedly called

to tell Plaintiffs that they believed A.S. had an ear infection, and that Ms. Delatorre asked Mrs.

Surina, "What kind of mother are you?" and then stated, "I wouldn't want my child to suffer." *Id.*

at ¶ 122.

On March 30, 2017, Plaintiffs initiated the instant action, claiming that District

Defendants had violated: 1) their Fourth and Fourteenth Amendment rights under the

Constitution to be free from a child abuse investigation; 2) their First Amendment rights by

retaliating against them for their unpopular speech protecting A.S.'s educational rights; and 3)

their rights under the New Jersey Civil Rights Act. Plaintiffs also accuse the District Defendants

of intentionally inflicting emotional distress upon them. As to the State Defendants, Plaintiffs assert violations of their constitutional rights under the Fourth, Fifth, and Fourteenth Amendments. This Court previously dismissed all of Plaintiffs' claims against Pruchnik, concluding that Pruchnik was not a state actor liable under § 1983. *Surina v. S. River Bd. of Educ.*, No. 17-2173, 2018 WL 1327111, at *5 (D.N.J. Mar. 15, 2018). In the instant matter, the State and District Defendants separately move to dismiss all claims against them.

## II.  LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

"Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). Eleventh Amendment immunity may be invoked through a 12(b)(1) motion as depriving the court of subject matter jurisdiction. *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 694, n.2 (3d Cir. 1996) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984)). In an ordinary Rule 12(b)(1) motion, the plaintiff bears the burden of persuading the court that subject matter jurisdiction exists. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991), *cert. denied*, 501 U.S. 1222 (1991). Sovereign immunity, on the other hand, is an affirmative defense, and the burden of demonstrating immunity lies with the party asserting it. *See Carter v. City of Philadelphia*, 181 F.3d 339, 347 (3d Cir. 1999) (citing *Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140, 1144 (3d Cir. 1995)).

### B. Federal Rule of Civil Procedure 12(b)(6)

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). While Federal Rule of Civil Procedure 8(a)6 does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the Complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the "plausibility standard is not akin to a 'probability requirement,'…it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within the Third Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the reviewing court "outline[s] the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.* Finally, where "there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. This last step of the

plausibility analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.   DISCUSSION

### A.  Eleventh Amendment Immunity

At the outset, the Court turns to whether the State Defendants, who are employed by DCF and DCPP, enjoy sovereign immunity as state officials sued in their official capacities.[6] The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." The Amendment affords states and state agencies immunity from suits brought by citizens in federal court, regardless of whether legal or equitable relief is sought. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 100–101 (1984); *see also Thorpe v. New Jersey*, 246 F. App'x 86, 87 (3d Cir. 2007) ("The Eleventh Amendment of the U.S. Constitution protects a state or state agency from a suit brought in federal court by one of its own citizens regardless of the relief sought. ...."). Eleventh Amendment immunity from suit also extends to agencies, departments, and officials of the state when the state is the real party in interest. *Alabama v. Pugh*, 438 U.S. 781, 781 (1978); *Pa. Fed'n of Sportsmen's Clubs*, Inc. v. Hess, 297 F.3d 310, 323 (3d. Cir. 2002); *Chisolm v. McManimon*, 275 F.3d 315, 323 (3d Cir. 2001). The Third Circuit has long held that DCF and DCPP, formerly known as DYFS, are arms of the state for sovereign immunity purposes. *Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807, 811-12 (3d Cir. 2010)

---

[6] The only count in Plaintiffs' Complaint directed at State Defendants, Count III, alleges "violations of Plaintiffs' constitutional rights under the Fourth, Fifth, and Fourteenth Amendments," based on the allegation that they allowed DCPP workers to commit abuse of process by failing to promulgate adequate rules and regulations, failing to train employees, and establishing a policy or custom of allowing DCPP workers to commit abuse of process. Compl., at ¶¶ 139-40.

("DYFS is immune from suit under the Eleventh Amendment"); *Rich v. New Jersey*, No. 14-2075, 2015 WL 2226029, at *7 (D.N.J. May 12, 2015) ("DCF is an arm of the state for sovereign immunity purposes."). Officers employed by DCF and DCPP, sued in their official capacity, are also entitled to immunity. *Id.*

Although Eleventh Amendment immunity generally bars claims against State employees sued in their official capacities—including DCF and DCPP employees—federal claims for prospective injunctive relief may proceed. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–66 (1989); *Sossamon v. Texas*, 563 U.S. 277, 288–93 (2011). This exception for claims seeking prospective injunctive relief, initially recognized in *Ex parte Young*, 209 U.S. 123 (1908), is read narrowly, and does not permit claims for declaratory judgment as to past acts. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145–46 (1993) (discussing *Ex parte Young*). "The theory behind *Young* is that a state officer lacks the authority to enforce an unconstitutional state enactment, and thus the officer is stripped of his official or representative character and becomes subject to the consequences of his individual conduct." *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013). To determine whether a *Young* exception is appropriate, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Pa. Fed'n of Sportsmen's Clubs, Inc.*, 297 F.3d at 324 (quoting *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002)) (emphasis added).

Here, because State Defendants are employed by DCF and DCPP, recognized arms of the state, as officials of DCF and DCPP, they are entitled to immunity. Moreover, Plaintiffs have failed to demonstrate that an *Ex parte Young* exception applies to its claims against State Defendants. Although the injunctive relief that Plaintiffs request is prospective— "an order

requiring that the explicit instruction and policy be made requiring DCPP workers to refrain from abuse of process"—the Complaint contains no facts indicating that State Defendants' alleged violations of constitutional law is ongoing. *See Iqbal*, 556 U.S. at 678.[7] Indeed, the factual allegations concerning these violations in the Complaint are phrased in the past tense. Nonetheless, Plaintiffs argue that without such an order "Plaintiffs will likely be subject to future unconstitutional investigations by DCP[ ]P," but they have not supported this assertion with any concrete allegations of an imminent threat of a violation. Instead, Plaintiffs have only alleged that DCPP officials participated in an isolated welfare check at the Surina home at the behest of South River. There is no reason to believe that such conduct, even assuming, arguendo, that this welfare check amounted to a constitutional violation, will repeat in the future.

Rather, Plaintiffs rely only on bald assertions "on information and belief" that State Defendants "failed to promulgate adequate rules and regulations regarding avoidance of threats and abuse of process in the investigation of allegations of child abuse," and further, "failed to instruct, discipline and train in the appropriate methods for handling and investigating allegations of child abuse without resorting to threats and abuse of process." Compl., at ¶ 139. Plaintiffs also assert that State Defendants "established through tacit authorization or explicit instruction a policy or custom of allowing [DCPP] workers to commit abuse of process .... [t]hat policy was enacted and enforced with deliberate indifference to the constitutional rights of Plaintiffs." *Id.* at ¶ 140. However, even taking these allegations as true, they generally refer to policies or failures in the past tense, and Plaintiffs have not alleged any facts suggesting that these purported violations are ongoing. Without these specific allegations, Plaintiffs' requested injunctive relief

---

[7] In reaching this conclusion, the Court need not reach questions of whether Plaintiffs have sufficiently alleged a violation of federal law or whether the acts of DCPP workers who conducted the welfare check can be imputed to the supervisors, Von Pier and Blake.

cannot be "designed to end a continuing violation of federal law." *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 319 (3d Cir. 2013). Therefore, the *Young* exception does not apply.

In sum, due to Eleventh Amendment sovereign immunity, Plaintiffs' claims against State Defendants are dismissed.

**B. Failure to State a Claim – District Defendants**

Plaintiffs assert the following four claims against the District Defendants: 1) violations, under 42 U.S.C. §1983, of Plaintiffs' Fourth and Fourteenth Amendment rights under the Constitution to be free from a child abuse investigation absent credible evidence; 2) violations of Plaintiffs' First Amendment rights by retaliating against them for their unpopular speech protecting A.S.'s educational rights; 3) violations of Plaintiffs' rights under the New Jersey Civil Rights Act; and 4) intentional infliction of emotional distress. District Defendants move to dismiss, arguing that Plaintiffs have not asserted cognizable claims against them.

**1. Count I: Violation of Plaintiffs' Fourth and Fourteenth Amendment Rights**

The Court first turns to Plaintiff's Fourteenth and Fourth Amendment claims against the individual District Defendants. Plaintiffs assert that these Defendants "each actively participated in, directed and/or knew of, and acquiesced in the unlawful investigation, detention and interrogation without credible evidence of child abuse and neglect in violation of plaintiffs' clearly established Fourth and Fourteenth Amendment rights." Compl., at ¶ 129. For the following reasons, this claim fails as to all of the District Defendants.

**i. Fourteenth Amendment**

In order to assert a substantive due process claim under the Fourteenth Amendment, Plaintiffs must identify a "fundamental liberty interest" that Defendants' actions have violated.

The liberty interest at issue here is the long-recognized "constitutionally protected liberty interest[ ] that parents have in the custody, care and management of their children." *Croft*, 103 F.3d at 1125 (3d Cir. 1997). This right "prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process." *Id.* at 15. However, this interest is not absolute, but "is limited by the compelling governmental interest in the protection of children—particularly where the children need to be protected from their own parents." *Id.* In other words, the right to family integrity "does not include a right to remain free from child abuse investigations." *Id.* (emphasis added). Thus, "[w]hatever disruption or disintegration of family life [plaintiffs] may have suffered as a result of the county's child abuse investigation does not, in and of itself, constitute a constitutional deprivation." *Id.* at 1125-26. As long as the state has "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse," the child abuse investigation will not infringe on a plaintiff's fundamental rights. *Id.* at 1126.

In *Kelly v. Pier*, a court in this District applied these legal principles to a dispute very similar to the present action. No. 16-3417, 2017 WL 3397030 (D.N.J. Aug. 8, 2017). There, the plaintiffs accused municipal and state defendants of conspiring to falsely report and investigate allegations of child abuse against the plaintiffs, in violation of their constitutional rights. The plaintiffs alleged that the municipal defendants, in an act of retaliation based on a belief that plaintiffs had issued a complaint against them, initiated several DCPP child abuse investigations. These reports were based, in part, on concerns about unhealthy conditions in the plaintiffs' home, including the presence of non-domesticated animals. *Id.* at *3. Noting that that Plaintiffs'

rights "do[ ] not include a right to remain free from child abuse investigations," the court found

that the children

> were not removed from their home, nor did Plaintiffs allege that DCPP officials
> made threats to remove the children. Rather, the DCPP performed traditional
> investigative functions in connection with an allegation of abuse and neglect:
> following up at the school, speaking with the children, visiting the home, and
> interviewing the parents.

*Id.* at *10. Thus "the complained of conduct [there]—several DCPP investigations (without any

concomitant action)—[did] not appear to be a protected constitutional right. *Id.* at *9.

Here, as in *Kelly*, Defendants had reasonable suspicion to request an investigation into

Plaintiffs' treatment of A.S. Ms. Delatorre, concerned about A.S.'s extended absence and his

documented hygiene issues, filed a report to initiate a DCPP investigation. Importantly, the

Complaint does not dispute that Ms. Delatorre honestly held these concerns, and even admits that

Mrs. Surina obtained a nurse's log documenting complaints about A.S.'s hygiene predating the

welfare check. After the report to DCPP, Patrolman Waranowicz and the DCPP investigators then

conducted the check, in which the DCPP workers "visit[e]d the home" and "interview[ed] the

parents." *Id* at *10. Nothing about the reporting or investigation approached the level of a

substantive due process violation. Indeed, the Third Circuit has noted that the Supreme Court has

never held even *temporary* removal of a child to be the basis for a substantive due process

violation, "whatever the circumstances of the removal." *Mammaro v. New Jersey Div. of Child

Prot*. & Permanency, 814 F.3d 164, 170 (3d Cir. 2016) (emphasis added). Where, as here, an

investigation is founded on reasonable suspicions and does not even end in the removal of a

child, no fundamental liberty interest has been violated.

Plaintiffs argue, in the alternative, that the individual Defendants are liable under the

Fourteenth Amendment Substantive Due Process Clause because their actions were "so ill-

conceived or malicious that it shocks the conscience." *Miller v. City of Philadelphia*, 174 F.3d

368, 375 (3d Cir.1999). The "shocks the conscience" test is not precise, but it is a high bar—

"[w]hat shocks the conscience is only the most egregious official conduct." *Eichenlaub v. Twp.*

*of Indiana*, 385 F.3d 274, 285 (3d Cir.2004) (internal quotations and citations omitted); *Strategic*

*Envtl. Partners, LLC v. Bucco*, 184 F. Supp. 3d 108, 129 (D.N.J. 2016). Notably, "improper

motive alone is not enough to shock the conscience." *Id.* (citing *Locust Valley Golf Club, Inc. v.*

*Upper Saucon Twp.*, 391 Fed.Appx. 195, 199 (3rd Cir. 2010)). Aside from a perfunctory

reference to the "shocks the conscious" test in its opposition brief, Plaintiffs have not indicated,

and the Court cannot glean, which of Defendants' actions meet this exacting standard. Indeed,

based on the allegations, none of Defendants' actions rise to the level of shocking the conscious.

Thus, Plaintiffs have failed to state a claim for violation of their Fourteenth Amendment

substantive due process rights.

### ii. Fourth Amendment

The Fourth Amendment ensures that the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const., Amend. IV; accord N.J. Const. art. 1, ¶ 7. The United States Constitution, "by virtue

of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers."

*New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (quoting *Elkins v. United States*, 364 U.S. 206,

213 (1960)). As state officers, public school officials are subject to the Fourth Amendment's

prohibition against unreasonable searches and seizures. *See id.* Indeed, the Supreme Court has

held that "the Fourth Amendment applies to searches conducted by school authorities." *Id.* at

337. Although, under the Fourth Amendment, searches and seizures inside a home without a

warrant are presumptively unreasonable, the Supreme Court has recognized exceptions to the

warrant requirement, including where voluntary consent has been obtained from a person with authority over the premises to be searched. *See United States v. Karo*, 468 U.S. 705, 717 (1984)

Here, Plaintiffs assert that the individual District Defendants violated Plaintiffs' Fourth Amendment rights, as "part of the wider conspiracy" in which individual District Defendants retaliated against Plaintiffs due to their advocacy for their son's educational needs by instigating an unconstitutional search of Plaintiffs' home. As an initial matter, besides the vague reference to a conspiracy with the DCPP, the Complaint does not allege any involvement by the individual District Defendants in the search. Ms. Delatorre, for instance, after "conferring" with Mr. Sherman and Mr. Pfister, merely contacted the DCPP to report potential neglect, and then the DCPP case workers subsequently performed the welfare check. Ms. Pribyl and Mr. Erlich had no connection to the welfare check at all. Plaintiffs cite no authority suggesting that such tangential (or nonexistent) conduct can constitute a search or seizure under the Fourth Amendment.

In fact, the case that Plaintiffs rely on to support their argument, *Phillips v. County of Orange,* states explicitly that "the Fourth Amendment "applies in the context of the seizure of a child *by a government agency official* during a civil child abuse or maltreatment investigation." 894 F.Supp.2d 345, 380 (S.D.N.Y. 2012) (emphasis added). Where, as here, the individual Defendants merely requested a child abuse investigation that concluded without any seizure of a child, no liability may be imputed under the Fourth Amendment. Accordingly, Count I is dismissed against all Defendants.

### 2. Count II: Violation of Plaintiffs' First Amendment Rights to Advocate

Plaintiffs also assert a § 1983 First Amendment retaliation claim. To properly state such a claim, a plaintiff must allege facts showing: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights,

and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Thomas v. Independence Twp.*, 463F.3d 285, 296 (3d Cir. 2006). "The key question in determining whether a cognizable First Amendment claim has been stated is whether the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (citations and quotations omitted).

Although the Complaint asserts this count, summarily, against all of the District Defendants, in its briefing, Plaintiffs clarify that only Mr. Pfister, Mr. Sherman, and Ms. Delatorre engaged in retaliatory conduct. Plaintiffs assert, first, that Ms. Delatorre's "false reporting" to DCPP, after conferring with Pfister and Sherman about A.S.'s absence from school, amounted to retaliatory conduct that was aimed at deterring Plaintiffs from pursuing their due process rights. Compl., at ¶ 45. However, Plaintiffs have failed to allege any facts indicating a causal link between the allegedly constitutionally protected conduct and the alleged retaliation. Plaintiffs allege that Ms. Delatorre "falsely" filed the DCPP report, presumably in retaliation for Mrs. Surina submitting a request to enforce a court order on March 23, 2016. However, there is no allegation that Ms. Delattore was aware of that request. *See Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("[F]or protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct."). Further, Ms. Delatorre had sent a truant officer to the Surina home on March 21, 2016, indicating that she clearly had an interest in monitoring A.S.'s absence even before Mrs. Surina filed her request on March 23rd or before Ms. Delatorre filed her report. Plaintiffs also assert that Mr. Sherman was involved in Officer Nielsen filing false suspicious person reports in retaliation for Plaintiff's filing a harassment complaint, and that Sherman revoked Plaintiffs' special school

drop-off privileges in retaliation for their filing a complaint with the New Jersey Office of Special Education Programs. Again, here, there is no allegation of causality, as Plaintiffs do not allege that Mr. Sherman was aware of the filings made by Plaintiffs.

Further, as retaliatory conduct, the Complaint alleges that Ms. Delatorre falsely accused Plaintiffs of medical neglect and stated to Mrs. Surina, "What kind of mother are you?" and "I wouldn't want my child to suffer." Compl., at ¶ 122. Plaintiffs also allege that Mr. Pfister made a "threat" that the school district would defend itself if Plaintiffs pursued due process for their son. This conduct does not approach the level necessary to "deter a person of ordinary firmness from exercising his First Amendment rights." *McKee*, 436 F.3d at 170 (quoting *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir.2003) (noting that "courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands").

Thus, Count II is dismissed, but the Court will grant Plaintiffs leave to amend in order to plead causality.

### 3. *Monell* Claim Against South River

The District Defendants contend that all § 1983 claims against the South River Board of Education must be dismissed because a court may not impute the alleged acts of its employees against the school district. To bring a claim under Section 1983, a plaintiff must show that, among other things, the defendant "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981))."Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each [defendant], through [her] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (citing *Monell v. Dep't*

*of Soc. Services*, 436 U.S. 658, 691 (1978); *Robertson v. Sichel*, 127 U.S. 507, 515-16

(1888); *Dunlop v. Munroe*, 11 U.S. 242 (1812)). In other words, under *Monell* a municipality

cannot be held liable solely because it employs an alleged tortfeasor, but "is liable under § 1983

when a plaintiff can demonstrate that the municipality itself, through the implementation of a

municipal policy or custom, causes a constitutional violation." *Mann v. Palmerton Area Sch.*

*Dist.*, 872 F.3d 165, 175 (3d Cir. 2017), 872 F.3d at 175; *see also Thomas*, 749 F.3d at 222;

*McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009).

Indeed, as to the policy or custom, "A policy may be made only when a policymaker

issues an official proclamation or decision." *Hernandez v. Borough of Palisades Park Police*

*Dep't*, 58 Fed. Appx. 909, 912 (3d Cir. 2003). Conversely, "[a] custom may exist where the

relevant practice is so permanent and 'widespread as to have the force of law.'" *Hernandez*, 58

Fed. Appx. at 912 (quoting *Bryan Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). In

addition to imposing liability through a municipality's custom or policy, liability may also exist

on a *Monell* claim based on a municipal defendant's failure to properly train employees to avoid

violating constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (holding that a

municipality's failure to train its employees in a relevant respect must amount to "deliberate

indifference to the rights of persons with whom the [untrained employees] come into contact.").

The District Defendants contend that Plaintiffs have not sufficiently alleged that the

school district's implementation of a policy or custom or its failure to train employees caused a

violation of A.B.'s constitutional rights. Plaintiffs, for their part, respond in their brief that South

River "has either instituted a policy of improperly using false reports to DCP[ ]P as a means of

retaliation against parents of schoolchildren or demonstrated deliberate indifference in allowing

for a pattern of such false reporting to continue without properly training its employees or

agents." ECF No. 35 at 30–31. Despite Plaintiffs' belated assertion of *Monell* liability its brief, the Court is unable to discern any allegations in the Complaint accusing South River of instituting such a policy or custom, or failing to train its employees. As such, all § 1983 claims against South River are also dismissed, but Plaintiffs will be given leave to amend to assert a *Monell* claim against the District.

### 4. Count IV: New Jersey Civil Rights Act

Plaintiffs also bring a claim under the NJCRA. The NJCRA provides a similar cause of action to § 1983, stating, in relevant part,

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann. § 10:6-2(c). Due to the intentional statutory similarities, this provision "is interpreted as analogous to § 1983." *Szemple v. Corr. Med. Servs., Inc.*, 493 Fed.Appx. 238, 241 (3d Cir. 2012) ("To sustain a § 1983 claim, or a NJCRA claim, a plaintiff must show that a defendant had in place a custom or policy which resulted in constitutional deprivation.").

The NJCRA "was intended to provide New Jersey citizens with a state analogue to Section § 1983 actions," and in that regard, just like § 1983, a private right of action under the NJCRA requires the presence of state action. *See Marjac, L.L.C. v. Trenk*, No. 06-1440, 2009 U.S. Dist. LEXIS 59830, at *9, 2009 WL 2143686 (D.N.J. Jul. 14, 2009) ("Plaintiffs are required to come forward with evidence that their constitutional rights, under the federal or state constitutions, have been violated as a result of some state action."), *rev'd on other grounds*, 380 Fed. Appx. 142 (3d Cir. 2010). Indeed, NJCRA is interpreted as analogous to Section

1983. *See Szemple v. Corr. Med. Servs.*, 493 Fed. Appx. 238, 241 (3d Cir. 2012); *Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443 (D.N.J. 2011); *Rezem Family Assocs., LP v. Borough of Millstone*, 423 N.J. Super. 103, 115 (App. Div. 2011).

Because Plaintiffs have not adequately alleged that Defendants violated any of their federal constitutional rights under Section 1983, they have similarly failed to adequately allege violations of these rights under the NJCRA. Additionally, Plaintiffs have not specified which of their rights under the New Jersey Constitution, if any, Defendants have violated.[8] Therefore, Plaintiffs' NJCRA claim in Count IV is dismissed. If Plaintiffs amend the Complaint to reassert Count II, however, they may bring a parallel claim under the NJCRA.

### 5. Count V: Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, a party must plead "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Taylor v. Metzger*, 152 N.J. 490, 509 (1998) (citation omitted). New Jersey sets a "high bar" for a plaintiff to establish extreme and outrageous conduct. *See Taveras v. Resorts Int'l Hotel, Inc.*, No. 07-4555, 2008 WL 4372791, at *6 (D.N.J. Sept. 19, 2008) (citing *Fregara v. Jet Aviation Bus. Jets*, 764 F.Supp. 940, 956 (D.N.J. 1991)). "Only where reasonable persons may differ is it for the jury, subject to the control of the court, to determine whether the conduct alleged in this case is sufficiently extreme and outrageous to warrant liability." *McConnell v.*

---

[8] It is unclear whether Plaintiffs assert an equal protection claim under the NJCRA. To the extent that they do, this must also fail. The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prevail on an equal protection claim, a plaintiff must present evidence that he or she has been treated differently from persons who are similarly situated. See *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Here, Plaintiffs have not alleged that they were treated differently from other persons who are similarly situated. Indeed, the Complaint contains no facts related to the treatment of others who are similarly situated.

*State Farm Mut. Ins. Co.*, 61 F. Supp. 2d 356, 363 (D.N.J. 1999) (internal quotation marks omitted).

Plaintiffs assert that the individual District Defendants' actions constituted "clear malicious retaliation against Plaintiffs for their pursuit of due process rights in support of their son's education is absolutely outrageous and has caused Plaintiffs an amount of distress that no one should have to endure."[9] ECF No. 35 at 37–38. For the same reasons that the Court has already discussed in dismissing the First Amendment retaliation claim, Plaintiffs have not alleged any intentional conduct by District Defendants that was extreme or outrageous. *See DeAngelis v. Hill*, 180 N.J. 1, 20 (2004).[10]

## IV.   **CONCLUSION**

For the foregoing reasons, State Defendants' Motion to Dismiss is granted, and Count III is dismissed with prejudice. District Defendants' Motions to Dismiss are granted with prejudice as to Count I and Count V, and without prejudice as to Count II and Count IV. Plaintiffs may amend their Complaint, consistent with this Opinion, as to Counts II and IV, within twenty (20) days of this Opinion.


Dated:  July 30, 2018                                   /s/ Freda L. Wolfson
                                                        Hon. Freda L. Wolfson
                                                        United States District Judge

---

[9] As to South River, the New Jersey Tort Claims Act ("TCA"), N.J.S.A. §59:1-1, provides that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice or willful misconduct." Thus, an intentional tort claim cannot be maintained against a public entity. *See Soto v. City of Newark*, 72 F. Supp. 2d 489, 497 (D.N.J. 1999).

[10] The District Defendants assert that even if Plaintiffs have stated a claim for intentional infliction of emotional distress, a New Jersey statute, N.J.S.A. § 9:6-8.13, "expressly immunizes from civil liability any individual who makes a good faith report of suspected abuse or neglect, which "is to be broadly construed." ECF No. 27-4 at 39 (citing *F.A. v. W.J.F.*, 280 N.J. Super. 570 (1995)). As I find that Plaintiffs have not stated a claim for IIED, I need not reach this issue.